# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| DAVID BLACKETT,<br>*Plaintiff*, | |
| v. | No. 3:14-cv-01896 (JAM) |
| WHOLE FOODS MARKET GROUP, INC.,<br>*Defendant*. | |

## RULING ON MOTION FOR SUMMARY JUDGMENT

Plaintiff David Blackett worked in the seafood department for defendant Whole Foods Market Group, Inc. (Whole Foods) at one of its stores in Greenwich, Connecticut. Plaintiff suffered two injuries that led to his taking three separate medical leaves of absence. Defendant declined to give plaintiff his job back or to re-hire him for another position.

Plaintiff has now brought suit alleging claims of discrimination, interference, and retaliation under the Family Medical Leave Act (FMLA), the Americans with Disabilities Act (ADA), the Connecticut Fair Employment Practices Act (CFEPA), and a Connecticut law that prohibits workers' compensation retaliation. Defendant moves for summary judgment on all these claims. I will grant the motion in part and deny the motion in part.

### BACKGROUND

The following facts are either agreed upon by both parties or presented in the light most favorable to plaintiff as the non-moving party. Defendant hired plaintiff in July 2011 as a team member in the seafood department. In a matter of months, plaintiff was promoted to assistant seafood team leader; he worked in that role at the Chelsea store from January 2012 to May 2012, and then at the Greenwich store from May 2012 to the date of his separation in November 2013.

On September 6, 2012, plaintiff received an unsatisfactory work warning from his supervisor, Abraham Iglesias, the seafood team leader. Doc. #60-1 at 90. Within a month,

plaintiff had drastically improved, prompting Iglesias to send a glowing e-mail to store

leadership indicating plaintiff's significant strides, even if improvement was still needed in

"store ops." Doc. #68-13 at 2.

On September 11, 2012, plaintiff slipped and fell in defendant's parking lot, and injured

his shoulder, which required rotator cuff surgery. Docs. #68-2 at 2 ¶ 3; #68-14 at 2. He took a

leave of absence from November 27, 2012 to January 29, 2013. Defendant later classified this

leave as FMLA leave, although plaintiff's employment records do not indicate that this leave

was FMLA-classified. Doc. #60-1 at 99. Plaintiff never filled out the required FMLA form for

this absence, and defendant did not notify him in writing that this leave would be designated as

FMLA leave, contrary to the dictate of its employee manual, *id.* at 12, as well as the FMLA. *See*

29 C.F.R. § 825.300(d)(1).

Plaintiff received workers' compensation during this leave of absence. Doc. #60-1 at 50.

After his surgery, plaintiff e-mailed the Whole Foods team to update them on his recovery, and

the store team leader, Pat Mulrooney, replied on November 29, 2012: "Thanks for reaching out.

Sorry to hear about the Pain!!!!! . . . Hang in there and keep us posted on your recovery!!!" Doc.

#68-39 at 6. When plaintiff determined that he could return to work on January 29, 2013, with

some very limiting restrictions—no lifting greater than five pounds in the left hand, no lifting the

left hand over his shoulder, and no repetitive work with the left hand—he notified his

supervisors, who immediately accommodated him with light work. Plaintiff's light work

involved back-of-the-house office tasks, auditing the tags throughout the store, and other small

tasks that required the use of only one arm. This arrangement was memorialized in a Transitional

Duty Return to Work Agreement, which provided for a "temporary position[ ] designed to assist

the team [m]ember back to his/her regular job." Doc. #60-1 at 95.

Despite this seemingly warm welcome back in January, plaintiff also perceived some negative attitudes towards him upon his return, including when Iglesias told him "Nice vacation. I hope you enjoyed your time off." Doc. #68-6 at 34. After two to three weeks of back-office work, plaintiff was called to the store team leader's office with Iglesias, and was told that there was not enough light work for him to do. Doc. #60-1 at 40. Plaintiff was asked to take another leave of absence, which would again be covered by workers' compensation, beginning on February 19, 2013. Plaintiff acquiesced, consistent with a prior e-mail in which plaintiff expressed some willingness to wait to return to work until his doctor cleared him with fewer restrictions. *See* Doc. #68-39 at 2–4. For this second leave of absence, the requisite FMLA paperwork appears to have been filled out at least on defendant's part (but not on plaintiff's—he never signed the form), indicating that plaintiff had taken FMLA leave in the prior 12 months. Doc. #60-1 at 97. Plaintiff's employment records reflect his leave as FMLA-classified.

By the time plaintiff was to return from his second leave, both of his direct supervisors had (or would very soon) change: plaintiff's seafood team leader, Iglesias, had been replaced by Scott Place, and the store team leader, Pat Mulrooney, would be replaced within days by Bimini Hayes. On March 29, 2013, plaintiff e-mailed his new supervisors a medical certification clearing him to return to work with fewer restrictions than he had had after his first leave of absence. Unlike after his first leave, when plaintiff had described his arm as "pretty useless," Doc. #68-39 at 2, plaintiff stated that he was now able to do "pretty much anything . . . except maybe opening and closing wich requires heavy lifting. the Dr. anticipates full capacity by end of April." Doc. #68-18 at 2.

Plaintiff's new supervisors were less confident about his recovery. Place e-mailed Hayes (and others in the store) that he felt "apprehensive" about plaintiff's returning to the seafood

department with physical restrictions, noting that he felt "strongly" that plaintiff should not come

back until he had a 100% medical clearance. Doc. #68-19 at 2. Place quarreled with plaintiff's

assertion that he could do "pretty much anything," pointing to two specific activities plaintiff

would be unable to do—lifting cases and putting out the soup. *Ibid*. Place noted that the seafood

schedule already suffered for lack of employees able to open and close the department, and he

also wrote: "I think we are playing with fire if he comes back without a 100 %

clearance . . . . Who is to say he is [not] going to lift something the wrong way then we are back

to square one." *Ibid*.

Despite Place's concerns, Hayes decided to offer plaintiff a species of light duty work, as

had Mulrooney after plaintiff's first leave; she had plaintiff take on several "administrative

functions" as a shift leader for the entire store (not just the seafood department) upon his return

on April 8, 2013. Docs. #68-3 at 9–11; #68-20 at 2 (describing this as a "Transitional Job

Modification" to help accommodate his restrictions until he fully recovers). He reported directly

to Hayes in this role, Doc. #60-1 at 32, and Hayes indicated that he did the job satisfactorily.

Doc. #68-3 at 16. After two to three weeks of working as a shift leader, and even though plaintiff

was still not cleared to perform full-duty work, he was to transition back to the seafood

department, to be supervised for the first time by Place as the new seafood team leader.

But before plaintiff's transition back to the seafood department, and although Place had

not yet had any chance to supervise plaintiff, Place approached Hayes and indicated that he was

concerned about plaintiff's performance, doubting whether plaintiff had even a basic

understanding of what his job entailed. *Id*. As a result of this conversation, Hayes drafted a list of

plaintiff's job expectations, Doc. #68-21 at 2, a type of document intended to assist struggling

employees. Doc. #68-3 at 15. Hayes and Place presented this list of job expectations to plaintiff on April 22, 2013.

The parties dispute whether this list shows increased responsibilities, Doc. #68-2 at 2 ¶4, whether any change in responsibilities was merely the byproduct of having a new supervisor, *see* Doc. #60-1 at 75–77, or whether different responsibilities corresponded with plaintiff's continued medical restrictions, *see* Doc. #68-21 at 2; *see also* Doc. #60-1 at 87 (internal job description). In any event, plaintiff struggled with these new tasks and, on or about May 13, 2013, Hayes and Place presented plaintiff with a "note to file," detailing the tasks listed on his "job expectations" list for which plaintiff needed improvement.[1] Plaintiff told Hayes that he struggled with some of the new tasks he had been given, such as using the purchase order systems, because he had not been properly trained to handle them. *See* Doc. #60-1 at 75–76. But when he asked Hayes for training, he was rebuffed and told that he would learn through his mistakes. Doc. #68-6 at 33.

The "note to file" stated that plaintiff would not be issued a written warning if he had made a "marked improvement" in his performance within 30 days. Doc. #60-1 at 103. Within 17 days, however, plaintiff received a written warning for "continu[ing] to struggle with daily operations and with store Ops." *Id.* at 105. This time, plaintiff was not given a time frame within which to improve, *id.* at 106, but he later learned that he should have improved within eight days, because he received a final warning on June 7, 2013, in which he had 30 days to improve or else risk termination. *Id.* at 108.

---

[1] Both parties state that this note to file was presented to plaintiff on April 22, 2013, but it would appear that the reference to "April 22, 2013" in the note to file was merely an indication that the "job expectations" list had been given to plaintiff on that date. The note to file goes on to state that, on May 13, 2013, plaintiff's work performance was lacking; therefore, the earliest this note to file could have been presented to plaintiff was May 13, 2013.

He did not make it to 30 days. On June 18, 2013, he aggravated an old back injury while at home and, after informing Marlene Reyes, defendant's benefits coordinator for the Greenwich store, plaintiff began a leave of absence on June 20, 2013. Soon after he began his leave, he learned that he required intensive back surgery, and he e-mailed this information to Hayes, Place, and Reyes. Doc. #68-27 at 3. Reyes eventually sent him paperwork so that he could receive short-term disability payments, which he did. Doc. #68-28 at 2. And for the first time in his three medical leaves of absence, plaintiff was told, in writing, that this leave would be FMLA-classified, and he was sent the proper FMLA forms. Doc. #68-27 at 4. This leave was, again, not noted in plaintiff's employment records. *See* Doc. #60-1 at 99.

The FMLA form that plaintiff received noted that he had taken FMLA leave in the prior 12 months, and that this current FMLA leave was to begin on June 20, 2013, and become exhausted by July 23, 2013. Doc. #68-25 at 2–3. After July 23, 2013, plaintiff's leave would then be classified under state law as CT FMLA leave, *id.* at 2, although the form did not indicate on exactly which date his CT FMLA would become exhausted (according to this calculation, or August 20, 2013).

Plaintiff received this crucial FMLA form not before July 16, 2013, after he had already scheduled and completed back surgery which defendant knew would keep plaintiff out of work for at least six weeks, or until August 20, 2013. *See* Doc. #68-27 at 2–5. Put in context, plaintiff received his first ever notice of FMLA usage and rights one week before expiration of (what the form indicated was) all of his federal FMLA leave, and after he had already undergone surgery that would leave him unable to return to work until, at the earliest, *exactly* when his CT FMLA leave would expire. The form plaintiff received was not only the first notice plaintiff received

about his FMLA rights, but, as will soon be discussed, it miscalculated his leave time, and it did not indicate that plaintiff would be taking extended medical non-occupational (EMN) leave.[2]

On August 13 and 21, 2013, plaintiff sent defendant medical certifications from his physician, indicating that he could return to light-duty work by September 10, 2013, and full-duty work on October 1, 2013. Docs. #60-1 at 110–13; #68-29 at 2.[3] Reyes forwarded this doctor's note to John Flaim, the regional benefits coordinator, who then drafted a letter in response on August 21, 2013. Docs. #70-2 at 4; #68-10 at 25–26. The letter indicated that plaintiff had exhausted his state and federal FMLA leave, but that he would be moved to EMN leave for an additional two weeks, or until September 4, 2013. Doc. #68-30 at 2. The mandatory return date of September 4, 2013, would have been consistent with defendant's EMN policy of allowing two weeks beyond CT FMLA leave, and consistent with the erroneous calculation of plaintiff's FMLA leave from the form he received on or around July 16, 2013. *See* Doc. #68-25 at 2–3. Plaintiff was told that his same position and pay rate would not be guaranteed upon his return, Doc. #68-30 at 2, even if, unbeknownst to plaintiff, defendant had sometimes bent this

---

[2] Defendant's policies required employees to take FMLA leave prior to any other leave of absence available under its policies. Doc. #60-1 at 10. After employees exhausted their FMLA leave time, defendant offered discretionary EMN leave to employees with persisting non-occupational medical issues. Defendant's written policy provides EMN leave two weeks beyond exhaustion of CT FMLA leave, and even more time beyond those extra two weeks in the discretion of defendant's regional office. *Id.* at 13, 27. To receive EMN leave, an employee must complete a leave of absence form. *Id.* at 13.

[3] It may have been at this point—receipt of plaintiff's medical certification—that defendant realized that it had never notified plaintiff that his protected leaves had expired, leaving his federal and state rights to reinstatement behind, or that plaintiff might be eligible for EMN leave. *See* Doc. #70-1 at 4–5 (e-mail indicating that "he should have been sent an LOA letter which explains his status under EMN . . . . If he has not been made aware of this, we need to let him know ASAP."); Doc. #60-1 at 26 (defendant's internal policy was to notify an employee in writing as soon as EMN leave would start—that is, as soon as that employee exhausted all FMLA and CT FMLA leave). The record does not conclusively reveal whose responsibility it should have been to administer defendant's leave policies. Reyes, the Greenwich benefits coordinator, was plaintiff's principal contact in coordinating his leaves of absence. But Reyes answered to Hayes, the store team leader; the regional benefits director, John Flaim; and several people in defendant's headquarters in Texas, including Sharon Shipman. When administering employee leave, Reyes would receive information from an employee, and forward it to Flaim, Doc. #70-2 at 5, even though it was not Flaim but Shipman who was responsible for calculating FMLA leave time, Doc. #68-10 at 21–24. It was also Shipman who would have been responsible for telling plaintiff his leave had expired. Doc. #70-2 at 5.

7

policy to allow for an employee to be reinstated to the same position upon return from EMN leave. Doc. #68-11 at 18.

Upon receipt of this letter, plaintiff immediately asked Reyes to clarify how she had calculated the return-to-work date, Doc. #68-31 at 2, even though it had actually been Flaim who calculated that date. Doc. #68-10 at 28. Plaintiff sprang to action upon receipt of the letter: this letter was the first time plaintiff had been informed that he had exhausted his protected leave under state or federal FMLA, had been moved to EMN leave, and been notified that his job position might not be guaranteed upon his return.

Reyes responded by e-mail about a week later, on August 28, 2013, with an entirely different calculation of leave time than the calculation on the form that plaintiff had signed, *see* Doc. #68-25 at 2, or the calculation set forth in the letter of August 21. The e-mail noted that plaintiff's first leave (44 working days) and second leave (34 working days) had been FMLA-classified, exhausting all of his federal FMLA leave by April 7, 2013. Doc. #68-32 at 2. His third leave would then exhaust all four weeks of CT FMLA by July 17, 2013, after which time he would have been eligible for EMN leave for two weeks, or until July 31, 2013. *Ibid*. The e-mail then explained that defendant had "decided to grant you additional [EMN] time" beyond the normal two weeks of EMN leave, until September 4 or 5, 2013, even though plaintiff had never requested it. *See* Doc. #70-2 at 6–7. Reyes' calculation of plaintiff's state and federal FMLA leaves appears to be accurate: plaintiff's first leave spanned nine calendar weeks, his second spanned seven weeks, and his third spanned 11 weeks.

Now faced with a mandatory return date prior to the date plaintiff had been cleared by his doctor for even light duty, and finally an explanation about how his leave time had been calculated, plaintiff immediately scrambled to call his doctor and ask whether he would be able

to return to full-duty work as early as September 4, 2013. Doc. #68-6 at 23–24. The doctor told plaintiff that it would be fine as long as plaintiff felt he could handle it. *Ibid*. The doctor wrote a new note, which plaintiff immediately forwarded to Hayes and Reyes on August 30, 2013, indicating that plaintiff would be able to return to full-duty on the mandatory return date he had been given. *Id.* at 25; Doc. #68-34 at 2.

But by the time defendant received plaintiff's second doctor's note, it had already posted plaintiff's job of assistant seafood team leader in the Greenwich store as vacant. Doc. #68-36 at 2 (job posted on August 29, 2013). Defendant also had John Martin, the assistant store team leader at the time, call plaintiff to tell him that, because of the discrepancy in the two doctor's notes— one authorizing full return to work and the other not allowing even a light-duty return— defendant wished to review plaintiff's medical records, and asked whether plaintiff would be willing to go to defendant's doctors at Concentra to make sure he was able to return to work. Doc. #68-6 at 26. Plaintiff provided the release and, after phone-calls back and forth to plaintiff's doctor, on September 9, 2013—past plaintiff's mandatory return date—Reyes e-mailed Flaim that she had confirmed with plaintiff's doctor that plaintiff was cleared to return to work as of September 4, 2013. Plaintiff never went to defendant's doctors at Concentra, and defendant never insisted.

On September 12, 2013, plaintiff met with Hayes and Reyes, who informed him for the first time that his position as assistant seafood team leader was no longer available to him, though Hayes did not indicate that it was vacant, or why he would be ineligible to apply for it. Hayes indicated that plaintiff was not fired, and that he could apply for any other position at Whole Foods, from team member to assistant team leader, using an internal system that posted job availabilities. *Id.* at 26–28. At some point during the process, plaintiff reached out to Reyes

for help navigating the internal job postings. Doc. #60-1 at 40. Plaintiff applied for the one comparable full-time position, as the other five or six postings were minimum-wage or part time positions. Doc. #68-6 at 29. That one full-time position had been filled by the time plaintiff was able to reach the kitchen manager on the phone. *Id.* at 30. Plaintiff's former position as assistant seafood team leader was filled by someone else on September 24, 2013. Doc. #68-36 at 2.

Throughout the time plaintiff was applying, Reyes and Flaim corresponded about how much time they should give plaintiff to apply for another position, with Flaim noting that it was "unfair" that plaintiff might only have 30 days from September 12. Doc. #70-2 at 7. On October 8, 2013, plaintiff received a letter from Reyes (which, again, had been drafted by Flaim, *id.* at 7–8), indicating that all had agreed to allow plaintiff another 30 days—until November 8, 2013—to find and secure another position at Whole Foods, or else be terminated. Doc. #60-1 at 85.

Plaintiff failed to secure another position, and was terminated. Hayes testifies that plaintiff was terminated because he did not timely return from his leave. *Id.* at 39. Flaim, who has never met or interacted with plaintiff, states that he was aware of plaintiff's poor performance and that, based on this understanding of plaintiff's performance, he counseled Hayes and Reyes that they would not be obligated to hold plaintiff's position open for him, Doc. #61 at 3 (¶¶ 9, 11), although he did not go so far as to state that plaintiff would have been fired as a result of his poor performance. Plaintiff's employment record contains two identical "Team Member Separation Forms"—with identical signatures from Hayes, and all else identical on the form—except that one indicates the reason for separation as "Voluntary Leaving/Other Reason," Doc. #68-9 at 2, and the other indicates the reason for separation as "Failed to Return from LOA," *id.* at 3. Plaintiff did not "grieve" his termination through defendant's internal policies. Doc. #68-6 at 32.

On December 12, 2014, plaintiff filed this action against defendant for FMLA interference and/or retaliation pursuant to 29 U.S.C. § 2617(a) (Count 1), CFEPA and ADA disability discrimination (Counts 2 and 5), CFEPA and ADA regarded-as disability discrimination (Counts 3 and 6), and workers' compensation retaliation pursuant to Conn. Gen. Stat. § 31-290a (Count 4).[4]

## DISCUSSION

The principles governing a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (*per curiam*). "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). The evidence adduced at the summary judgment stage must be viewed in the light most favorable to the non-moving party and with all ambiguities and reasonable inferences drawn against the moving party. *See, e.g.*, *Tolan*, 134 S. Ct. at 1866; *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). All in all, "a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan*, 134 S. Ct. at 1866 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

---

[4] At oral argument, plaintiff abandoned his claims of disability discrimination (Counts 2 and 5). If plaintiff disputes the import of his concessions at oral argument, he may file a motion for reconsideration within 10 days setting forth the basis for the Court's misunderstanding.

### *FMLA interference and/or retaliation (Count 1)*

The Second Circuit recognizes two types of FMLA claims—"interference" claims and "retaliation" claims. *See Potenza v. City of New York*, 365 F.3d 165, 167–68 (2d Cir. 2004) (*per curiam*). For plaintiff's claim of FMLA interference, he must "establish that the defendant denied or otherwise interfered with a benefit to which [he] was entitled under the FMLA," *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 424 (2d Cir. 2016) (citing 29 U.S.C. § 2615(a)(1)), even if the defendant never subjectively intended to interfere with plaintiff's FMLA rights. *See Wanamaker v. Westport Bd. of Educ.*, 11 F. Supp. 3d 51, 69 (D. Conn. 2014).

An employee who returns from FMLA-qualifying leave is entitled to be restored to the same or equivalent position upon timely return from his leave. *See* 29 U.S.C. § 2614(a). The right to reinstatement is "a benefit at the crux of the FMLA's provisions," *Fernandez v. Windmill Distrib. Co.*, 159 F. Supp. 3d 351, 363 (S.D.N.Y. 2016), and an employer who fails to reinstate an eligible employee may be liable for FMLA interference. *See* 29 U.S.C. § 2615(a)(1). It is undisputed that, on the date plaintiff attempted to return to work, he had already exhausted all of his state and federal FMLA leave, and an employee's failure to return to work before all of his leave has expired ordinarily dooms a failure-to-reinstate interference claim. *See Wanamaker*, 11 F. Supp. 3d at 71 (citing cases).

But not so for plaintiff, because a reasonable jury could conclude that defendant's woeful non-compliance with the FMLA's notice requirements prejudiced plaintiff in his ability to exercise the rights given to him under the FMLA, particularly the ability to "conform [his] desired period of leave to the employer's policies so as to preserve the right to reinstatement . . . ." *Fernandez*, 159 F. Supp. 3d at 363. An employer's "[f]ailure to follow the [FMLA] notice requirements [of 29 C.F.R. § 825.300] may constitute an interference

with . . . the exercise of an employee's FMLA rights," 29 C.F.R. § 825.300(e), so long as that

failure results in a prejudice to the employee. *See Ragsdale v. Wolverine World Wide, Inc.*, 535

U.S. 81, 90–91 (2002).

The first requirement of plaintiff's interference claim—defendant's failure to follow the

FMLA notice requirements—is undeniably met here. Defendant failed to provide eligibility

notice for plaintiff's first or second leave, which would have required it to notify plaintiff "of

[his] eligibility to take FMLA leave within five business days" of knowledge that plaintiff's

leave may be for an FMLA-qualifying reason. *See* 29 C.F.R. § 825.300(b)(1). Defendant also did

not follow the rights-and-responsibilities notice requirements as to these two leaves, or furnish

written notice of "the specific expectations and obligations of the employee [in taking FMLA

leave] and explaining any consequences of a failure to meet these obligations," *see* 29 C.F.R.

§ 825.300(c). Finally and most crucially, defendant failed to follow the designation notice

requirements as to all three of plaintiff's leaves, which would have required it to provide written

notice to plaintiff, within five business days of knowledge that a leave is being taken for a

FMLA-qualifying reason, "whether the leave will be designated and will be counted as FMLA

leave," 29 C.F.R. § 825.300(d)(1), and failed again by not providing written notice within five

business days of a change to plaintiff's designation notice, such as when plaintiff would exhaust

his FMLA leave. *Id.* at § 825.300(d)(5); *see also* Regs., Conn. State Agencies, § 31-51qq-19

(imposing same notice requirements for CT FMLA leave).

Plaintiff contends that he was prejudiced by defendant's failure to provide the required

FMLA notices because he was unable to exercise his rights in a way that could have preserved

his right to reinstatement. *See* Doc. #68 at 33; *Reyes v. Phoenix Beverages, Inc.*, 2016 WL

4991530, at *18 (E.D.N.Y. 2016) (lack of notice must have affected employee's exercise or

attempted exercise of a substantive right conferred by the FMLA). To this, defendant counters that, because plaintiff took more than 12 weeks of protected leave, he received all the benefits to which he was entitled, and therefore any lack of notice was harmless. *See Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 161–62 (2d Cir. 1999) ("[Plaintiff's] right to reinstatement could not have been impeded or affected by the lack of notice because his leave . . . continued [beyond] his 12-week FMLA leave period. Any lack of notice . . . could not rationally be found to have impeded [plaintiff's] return to work.").

Although this second requirement of plaintiff's interference claim—prejudice—is a closer call, it is one that presents a genuine issue of material fact for a jury to decide. To begin, a reasonable jury could conclude that plaintiff would have attempted to structure his leaves in order to preserve his right to reinstatement. *See Reid-Falcone v. Luzerne Cnty. Comm. College*, 2005 WL 1527792, at *5–*6 (M.D. Pa. 2005) (denying summary judgment on similar notice claim because plaintiff adduced evidence sufficient for a jury to conclude that she "would have structured her leave in such a manner as to preserve her reinstatement rights"). Given the number of times defendant failed to provide required notices to plaintiff, plaintiff might have structured his leaves differently any number of times, but lost the opportunity to do so. Indeed, on August 21, 2013, the moment plaintiff learned that his protected leave was coming to an end (or perhaps had already ended), he scrambled to return to work well prior to the date he had originally been medically cleared to return, showing a resolve and ability to influence the duration of his several leaves to small, but not insurmountable degrees.

And although defendant is correct that plaintiff received all 12 weeks of his federal leave, plaintiff might nevertheless have been prejudiced if he would have been medically able to structure his leaves differently in order to avail himself of his FMLA rights notwithstanding his

14

several severe and unplanned medical conditions. *See Ridgeway v. Royal Bank of Scotland Grp.*,
2013 WL 1985016, at *18 (D. Conn. 2013) (triable issue whether surgery was medically
necessary or could have been postponed). To this point, defendant has not met its initial burden
to show the absence of facts that could establish prejudice. *See Conoshenti v. Public Serv. Elec.
& Gas Co.*, 364 F.3d 135, 146 (3d Cir. 2004) (affirming denial of summary judgment on FMLA
interference claim where moving party failed to point to absence of evidence of prejudice).

After drawing all reasonable inferences in plaintiff's favor, the record reveals that, if
plaintiff had been given proper designation notices, he might have attempted to return to work
earlier from his first leave, or he might not have acquiesced in taking his second leave—a forced
leave—for lack of light duty work, and insisted that he was fit for duty, had he known that it
would have exhausted his state and federal FMLA allotments. *See* 29 C.F.R. § 825.312(b) (if
employer seeks fitness-for-duty certification, employer must provide employee with a list of the
essential functions of the employee's job and allow employee to have health care provider
determine whether employee can perform those essential functions); *Sista v. CDC Ixis N. Am.,
Inc.*, 445 F.3d 161, 175 (2d Cir. 2006) (forced FMLA leave may constitute actionable
interference if it results in denial of a substantive right under FMLA).

Defendant's later-given list of essential job functions—"performs all functions necessary
to assist the seafood team leader in the daily operation of the department," Doc. #60-1 at 110–
13—and plaintiff's job description, *id.* at 87, could lead a reasonable jury to conclude that
plaintiff would have been able to perform these functions even with shoulder limitations.
Additionally, had plaintiff received timely designation notices, he might have scheduled his back
surgery for a different time, affecting the duration of his third leave. *See Reid-Falcone*, 2005 WL
1527792, at *5–*6. A triable issue of fact therefore exists as to prejudice, including whether

15

plaintiff was impeded in the exercise of his rights, and/or might have been able to conform his leaves in a manner that preserved his right to reinstatement. *See Ridgeway*, 2013 WL 1985016, at *18. I will deny summary judgment on Count 1 with respect to plaintiff's claim of FMLA interference.

Plaintiff next brings a claim for FMLA retaliation, which follows the familiar *McDonnell-Douglas* burden-shifting standard, and requires plaintiff to show "that (1) he exercised rights protected under the FMLA; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 147 (2d Cir. 2012). Although defendant contends that plaintiff was not "qualified for his position" because he was not medically cleared to return to work at the moment his statutory leave ended, Doc. #58 at 40–41, the time to measure when plaintiff was qualified is the time of the adverse employment action, which was plaintiff's termination on November 8, 2013, at which time he was medically cleared to return to work. *See Turner v. Eastconn Regional Educ. Serv. Ctr.*, 2013 WL 6230092, at *17 (D. Conn. 2013), *aff'd*, 588 F. App'x 41 (2d Cir. 2014). Defendant's argument conflates the issue of whether plaintiff timely asserted his FMLA right to reinstatement (maybe not) with whether plaintiff's ultimate termination from a job for which he was qualified could have been motivated by retaliation for plaintiff's prior exercise of his FMLA rights (maybe so).

Defendant also asserts that plaintiff has not advanced evidence that the adverse employment action occurred under circumstances giving rise to an inference of retaliation for plaintiff's exercise of FMLA rights. Plaintiff must show that "a causal connection exists between the plaintiff's protected activity and the adverse action taken by the employer." *Donnelly*, 691

F.3d at 152. The temporal proximity between the time when plaintiff took his leave and his termination provides a sufficient basis for plaintiff to meet his "minimal burden" of establishing this prong. *See ibid.*; *Summerlin v. Almost Family, Inc.*, 2014 WL 1055576, at *3 (D. Conn. 2014).

The burden then shifts to defendant to provide a legitimate, non-discriminatory reason for the adverse action. Defendant has proffered two reasons for plaintiff's termination: his failure to timely return from protected leaves, and poor performance. As to the first reason, if a jury could find that defendant prejudicially interfered with plaintiff's leave (as I have discussed above), then plaintiff's failure to timely return from leave cannot constitute a legitimate basis for termination. *See Graziadio*, 817 F.3d at 429–30.

The second reason—plaintiff's alleged poor performance—could provide a legitimate, non-discriminatory reason for his discharge, and so the burden shifts back to plaintiff to show that this reason was a mere pretext for having fired him because he exercised his rights under the FMLA, a showing which requires him to demonstrate both that his employer's stated reason was untrue or incomplete *and* that discrimination played a causal role in his termination. *See, e.g.*, *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 157 (2d Cir. 2010).

Plaintiff has adduced evidence that his poor performance was not the real reason for his termination: neither Place, Hayes, nor Reyes indicated that plaintiff was terminated for his poor performance, and only Flaim obliquely advanced this reason, despite never having met plaintiff and potentially not having a say in the decision to terminate him. *Cf.* Doc. #60-1 at 21 (store team leader "has the final say because it's their store").

But even if defendant might not have fired plaintiff for his poor performance, there is no affirmative evidence that it fired him in retaliation for having taken FMLA leave. The evidence

presented by plaintiff does not causally connect plaintiff's leave with his termination:
defendant's shifting reasons for termination, Place's criticism of plaintiff's work performance
before he had even had a chance to be his supervisor, plaintiff's increased job responsibilities,
and the fact that his position was open when he attempted to return to that position, lack any
connection to plaintiff's exercise of rights under the FMLA. *Compare Donnelly*, 691 F.3d at 152
(negative evaluations that referenced protected absences); *Green v. Cellco P'ship*, --- F. Supp. 3d
---, 2016 WL 6462130, at *7 (D. Conn. 2016) (evidence that plaintiff was threatened with
termination if he took too much leave); *Mendillo v. Prudential Ins. Co. of Am.*, 156 F. Supp. 3d
317, 347 (D. Conn. 2016) (evidence that employer disliked plaintiff's protected absences).

Rather than disclosing any impermissible retaliatory motive on defendant's part, the
record reveals the opposite: when defendant realized its deficiencies in administering plaintiff's
leaves, it gave plaintiff more and more time to search for another job within the company. *See*
Doc. #70-2 at 7. Even though plaintiff's former position was vacant and never offered to him, the
record discloses no evidence that defendant extended time for plaintiff to find a new job within
Whole Foods, while secretly deciding to terminate him because he had exercised his rights under
the FMLA. *See Wanamaker*, 11 F. Supp. 3d at 74 ("the fact that Plaintiff in this case was given
this extended leave after she exhausted her FMLA leave weighs against a finding of retaliatory
motive on the part of Defendant"). Because plaintiff has raised no triable issue as to pretext, I
will grant summary judgment on his claim of FMLA retaliation in Count 1.

### Workers' compensation retaliation (Count 4)

Plaintiff's state law claim of workers' compensation retaliation requires proof that he was
exercising a right under Connecticut's workers' compensation statutes, and that defendant
discriminated against him for exercising that right. *See Diaz v. Hous. Auth. of Stamford*, 258

Conn. 724, 731 (2001). His claim is subject to the familiar *McDonnell-Douglas* burden-shifting framework. *See Ford v. Blue Cross & Blue Shield of Conn., Inc.*, 216 Conn. 40, 53 (1990).

In support of a causal connection between plaintiff's compensable injury and his termination, plaintiff notes that, immediately after he returned from his second leave, his job duties were increased and he was denied proper training, resulting in negative work evaluations that allegedly formed the basis of his termination. *See Hammond v. City of Bridgeport*, 139 Conn. App. 687, 695–96 (2012) (if evidence shows "that the defendant knew or was otherwise aware that the plaintiff had exercised [his] rights under the act," plaintiff may establish a causal connection "indirectly by showing that the protected activity was followed closely by discriminatory treatment"). This is sufficient to meet plaintiff's minimal *prima facie* burden.

Plaintiff fails to raise a triable issue, however, that defendant was motivated by retaliatory animus for plaintiff's exercise of rights under the workers' compensation laws. The specific evidence plaintiff points to other than his increased job duties—Iglesias' "nice vacation" comment, Doc. #68-6 at 34, plaintiff's forced second leave, and Place's concerns that plaintiff might reinjure himself if he returned to work too soon, Doc. #68-19 at 2—does not reasonably relate to plaintiff's exercise of rights under the workers' compensation laws. And even if it did, the evidence is not reasonably tied to the decision to terminate plaintiff, as neither Iglesias nor Place made the decision to terminate him, and plaintiff's second leave resulted in *additional* workers' compensation payments. Because plaintiff has not raised a genuine issue of fact that his termination was tied to his exercise of any right afforded to him by the workers' compensation statute, I will grant defendant's motion for summary judgment on Count 4.

***Discrimination on the basis of perceived disability in violation of the ADA and CFEPA (Counts 3 and 6)***

Finally, plaintiff alleges that defendants discriminated against him because they perceived him to be disabled, in violation of the ADA and CFEPA, which are analyzed under the same burden-shifting legal framework. *See McMillan v. City of N.Y.*, 711 F.3d 120, 125 (2d Cir. 2013); *Stoffan v. S. New Eng. Tel. Co.*, 4 F. Supp. 3d 364, 372 n.2 (D. Conn. 2014).

A plaintiff may establish a *prima facie* case of perceived disability discrimination if he can show by a preponderance of the evidence that: (1) his employer is subject to the ADA/CFEPA; (2) he was perceived to be disabled within the meaning of the ADA/CFEPA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his perceived disability. *See Stoffan*, 4 F. Supp. 3d at 372 n.2. An individual is regarded as disabled if he has "an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). If the perceived impairment is objectively transitory and minor, such as with an actual or expected duration of six months or less, an individual may not be perceived as disabled. *See* 42 U.S.C. § 12102(3)(B); *Percoco v. Lowe's Home Centers, LLC*, 2015 WL 5050171, at *2 (D. Conn. 2015).[5]

Two physical impairments, each of which required intensive surgery, affected plaintiff during his employment: his shoulder injury and his back injury. He injured his shoulder on

---

[5] The definition of disability under CFEPA is regarded as broader in scope than the ADA's definition of disability. *See DeAngelo v. Yellowbook, Inc.*, 105 F. Supp. 3d 166, 180 (D. Conn. 2015); Conn. Gen. Stat. § 46a-51(15) ("any chronic physical handicap, infirmity or impairment, whether congenital or resulting from bodily injury, organic processes or changes or from illness"). I have no reason to believe that, under CFEPA, the standard for being regarded-as disabled is any less broad when compared to its ADA counterpart. *See Desrosiers v. Diageo N. Am., Inc.*, 314 Conn. 773, 794–96 (2014) (summary judgment inappropriate for regarded-as disabled claim where defendant might have terminated plaintiff immediately after she notified defendant of need for surgery, and evidence otherwise revealed that defendant perceived plaintiff's medical condition to be worse than it was).

September 11, 2012, but commenced his workers' compensation leave on November 27, 2012. Prior to plaintiff's return to work in April 2013, Place acknowledged the severity and duration of plaintiff's shoulder impairment, commenting "Who is to say he is [not] going to lift something the wrong way then we are back to square one." Doc. #68-19 at 2. Plaintiff's shoulder impairment persisted through April 22, 2013, when he remained on light duty, Doc. #68-21 at 2, and likely through at least May 30, 2013. *See* Doc. #68-23 at 2 (plaintiff evaluated on his performance of light-duty tasks). After this over 6-month-long shoulder injury, plaintiff then suffered from a back injury that impacted him from mid-June through September of that year, if not later. Plaintiff has therefore raised a genuine issue of material fact of whether his impairments lasted long enough to fall outside the transitory-and-minor exception.

After consideration of defendant's stated non-discriminatory reason for termination—plaintiff's poor performance—and recognizing that the evidence shows that plaintiff's poor performance was not the real reason he was terminated, I conclude that plaintiff has raised a triable issue of fact as to whether defendant's proffered reason for his termination was a "pretext" for disability discrimination. *See Cortes v. MTA New York City Transit*, 802 F.3d 226, 231 (2d Cir. 2015). When plaintiff was to return from his second leave, his new supervisor immediately expressed strong opinions about not allowing plaintiff to return until his impairments were gone. *See* Doc. #68-19 at 2 ("I think we are playing with fire if he comes back without a 100 % clearance"). When plaintiff attempted to return from his third leave for his back injury, defendant second-guessed plaintiff's doctor's certifications, and insisted that he be evaluated by defendant's doctors, which no witness could explain, since that type of request is reserved only for employees who are injured on the job. *See* Doc. #68-10 at 30 ("We don't send

Concentra to team members that are injured unless it's at work."); Doc. #68-11 at 24 ("We do not do that.").

The evidence of defendant's concerns about plaintiff's physical impairments, coupled with the other evidence plaintiff has advanced—defendant's shifting reasons for termination, Place's criticism of plaintiff's work performance before he had even had a chance to be his supervisor, plaintiff's increased job responsibilities, and the fact that his position was open when he attempted to return to that position—raises a triable issue of whether plaintiff was terminated because he was regarded as disabled, and because defendants no longer wished to worry about a perpetually physically restricted employee. I will deny summary judgment on these two counts of disability discrimination.

## CONCLUSION

Defendant's motion for summary judgment (Doc. #57) is GRANTED with respect to Count 1 in part (FMLA retaliation), and Counts 2, 4, and 5; and DENIED with respect to Count 1 in part (FMLA interference), and Counts 3 and 6.

It is so ordered.

Dated at New Haven, Connecticut, this 27th day of March 2017.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge